# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DEMOCRATIC PARTY OF GEORGIA, INC., DSCC, and DCCC,

      Plaintiffs,

      v.

BRAD RAFFENSPERGER, in his official capacity as SECRETARY OF STATE OF GEORGIA; REBECCA N. SULLIVAN, DAVID J. WORLEY, SETH HARP, and ANH LEE, in their official capacities as Members of the Georgia State Election Board; and STEPHEN DAY, JOHN MANGANO, ALICE O'LENICK, BEN SATTERFIELD, and BEAUTY BALDWIN, in their official capacities as Members of the Gwinnett County Board of Registration and Elections,

      Defendants.

Civil Action File No.

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, DEMOCRATIC PARTY OF GEORGIA, INC., DSCC aka DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, and DCCC aka the DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, through the undersigned attorneys, file this COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF against Defendants, BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia; REBECCA N. SULLIVAN, DAVID J. WORLEY, SETH HARP and ANH LEE, in their official capacities as Members of the Georgia State Election Board; and STEPHEN DAY, JOHN MANGANO, ALICE O'LENICK, BEN SATTERFIELD and BEAUTY BALDWIN, in their official capacities as Members of the Gwinnett County Board of Registration and Elections. Based upon information and belief, Plaintiffs allege as follows:

## NATURE OF THE CASE

1.      "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Plaintiffs bring this lawsuit to protect this right and to prevent the disenfranchisement of Georgia voters whose absentee by-mail ("absentee") ballots have been rejected for missing or mismatched

signatures. The cause of this disenfranchisement is Georgia's standardless procedure for notifying absentee voters that their signatures are either missing or inconsistent, which fails to provide Georgia voters with a meaningful ability to cure their ballots within the prescribed timeframe. This disenfranchisement disproportionately impacts African-American and other minority voters and has a particularly detrimental impact on minority voters in Gwinnett County, who are further burdened by Gwinnett County's poorly designed, confusing absentee ballot envelope, which places these voters at a heightened risk of returning an absentee ballot without properly completing the signature requirement. Because of Georgia's standardless procedure, and Gwinnett County's confusing absentee ballot envelope design, hundreds of Georgia voters have had their ballots rejected and their votes have not been counted, and hundreds more face the same fate in the 2020 election without intervention from this Court.

2.    Absentee voting is extraordinarily popular among Georgia voters and has grown in popularity over time. Applications for absentee ballots surged in advance of the 2018 general elections, with over 281,000 Georgia voters requesting absentee ballots. And, despite the fact that turnout has historically been lower in midterm elections than in presidential elections, the total number of returned absentee ballots in the 2018 midterm election—nearly 284,393—was greater than

the number cast in the 2016 presidential election, 246,621.

3.      Georgia also routinely rejects a significant number of absentee ballots. Of the combined 531,014 absentee ballots cast in the past two general elections, 6,681 have been rejected for technical reasons wholly unrelated to the voter's qualifications, including failing to sign the oath on the back of the absentee ballot envelope or having a mismatched signature. During the 2016 general election, Georgia County Election Officials rejected 580 absentee ballots for missing or inaccurate oath information, including missing and mismatched signatures. And, in the 2018 general election, County Election Officials rejected 454 ballots for the same reason. One county—Gwinnett—rejected far more absentee ballots, 117, for missing or mismatched signatures than any other county.

4.      The number of absentee ballots rejected for a missing or mismatched signature is significant, especially when evaluated in context. *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("[t]he overall rates of rejection due to a signature mismatch have been low in recent general elections. But those rates should be put into perspective."). Recently, elections in Georgia have been decided by small margins. For example, the Democratic candidate in the 2018 gubernatorial race, who received a substantial majority of the votes cast by absentee ballots (137,616 out of the 223,576 absentee ballots cast), lost by under 55,000 votes (1.3 percentage

points). And in an even closer race, the Democratic candidate for Georgia's 7th Congressional District for the U.S. House of Representatives, who received 57 percent of the absentee ballot votes (10,466 out of 18,217 absentee ballots cast), lost by just 419 votes (.14 percentage points). Georgia's arbitrary rejection of absentee ballots not only disenfranchises individual voters, but it also leads to election results that may not reflect the will and intent of Georgia's electorate.

5.    Because such a significant number of absentee ballots have been rejected in Georgia, the State has seen a flood of litigation since the 2018 general election aimed at ending the disenfranchisement caused by the absentee voting regime. In a series of opinions, courts in this district have repeatedly found that outright rejection of absentee ballots for missing or inaccurate oath information violates the U.S. Constitution and the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B). *See Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga. 2018); *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018); *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018).

6.    As a result, the Georgia General Assembly amended the absentee voting scheme in an attempt to prevent absentee ballots from being rejected for technical reasons, including for missing or mismatched signatures. Specifically, the General Assembly modified the language of the oath on the absentee ballot envelope

to remove requests for certain technical information. And, adding to the existing requirement that election officials "promptly notify" the voter of a missing or mismatched signature, it required that election officials give a voter until three days after the date of the election to cure a signature before rejecting an absentee ballot for a missing or mismatched signature. O.C.G.A. §§ 21-2-386(a)(1)(C), -419(c).

7.     These reforms, however, do not remedy the flaws in Georgia's absentee ballot regime and will not end the unconstitutional disenfranchisement of voters. Most glaringly, the law still does not provide any timeliness standard for election officials to "promptly" notify voters of missing or mismatched signatures; nor does it provide any standard for the form of notice required. As a result, counties interpret "prompt" notice differently and use inconsistent methods to inform voters of the need to cure their absentee ballots. For example, some counties send letters by first-class mail, while others call or email voters. And some counties provide notification up to *three days* after identifying the missing signature. Such an interpretation is problematic for voters whose absentee ballots are submitted on or close to election day, as they are sent letters three days later and are not notified with sufficient time to cure during the three-day post-election period. Thus, depending on where the voter lives, she may not receive notice in time to cure and her ballot will be rejected outright, directly contrary to the U.S. Constitution and the rulings of

courts in this district.

8.      Without a uniform standard for the timing for election officials to provide notice to voters about missing or mismatched signatures or the method of notification, practices will continue to vary widely across the state, with each of Georgia's 159 counties establishing its own deadline and method. This hodgepodge approach unduly burdens absentee voters' right to vote.

9.      These burdens are exacerbated in Gwinnett County, whose high volume of absentee ballots with missing or mismatched signatures and corresponding high rejection rate is tied not only to Georgia's standardless notification regime, but directly to the confusing and opaque design of its absentee ballot envelope, which often prevents voters from even realizing that their signatures are required. Because Gwinnett County must include the oath in both English and Spanish on the envelope, it uses small, nearly illegible type in approximately 6.5-point font.[1] By way of example, this text is in size 6.5-point font.

10.     Given the deficient design of the Gwinnett County absentee ballot

_____

[1] Bureau of the Census, Department of Commerce, Voting Rights Act Amendments of 2006, Determinations Under Section 203, 81 Fed. Reg. 233, 87535 (Dec. 5, 2016), https://www.govinfo.gov/content/pkg/FR-2016-12-05/pdf/2016-28969.pdf (requiring Gwinnett County to provide voting material in both English and Spanish given its large Hispanic population).

envelope, the county rejected more absentee ballots for missing or mismatched signatures than any other county during the 2018 general election (117 of the 454 rejected ballots). The recent changes to the language in the oath on the ballot envelope do not address the design flaws; Gwinnett County's absentee ballot envelope remains lengthy and cramped, and voters will continue to find it indiscernible. As such, Gwinnett County's absentee ballot envelope design, coupled with the county's inadequate notification procedures under Georgia's standardless notification system, will continue to create an unusually high risk that voters who vote absentee will have their votes ultimately rejected for missing or mismatched signatures and be disenfranchised.

11.    Additionally, the continued rejection of absentee ballots for missing signatures will have a disproportionate effect on minority voters, who were twice as likely to have their absentee ballots rejected in 2018. This disparity is particularly acute in Gwinnett County, where people of color make up nearly 45 percent of registered voters. African-American and Latino voters make up over 35 percent of Gwinnett County's active voting population, and they accounted for 49 percent of rejected absentee ballots during the 2018 general election.

12.    Absent judicial intervention, voters who submit absentee ballots in Gwinnett County and other areas of the state will continue to have their votes thrown

out in future elections due to the standardless procedure for notifying voters of missing or mismatched signatures in clear violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution. Absentee voters in Gwinnett County will have their right to vote further burdened by the County's poorly designed ballot envelope in violation of the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

14.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

15.     This Court has personal jurisdiction over Defendants, who are sued in their official capacity only.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

17.     This Court has the authority to enter a declaratory judgment and to

provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

18. Plaintiff DEMOCRATIC PARTY OF GEORGIA, INC., ("DPG") is a state committee, as defined by 52 U.S.C. § 30101(15), dedicated to electing candidates of the Democratic Party to public office throughout the State of Georgia. DPG has members and constituents from across Georgia, including many eligible voters who regularly support and vote for candidates affiliated with the Democratic Party. As discussed *infra*, members and constituents of the Democratic Party risk having their right to vote burdened and/or denied due to the absentee voting scheme. DPG brings these claims on their behalf, as well as in its own right.

19. DPG is directly harmed by the Georgia's standardless absentee notification process and Gwinnett County's deficient absentee ballot envelope because each frustrates its mission and efforts to elect Democratic Party candidates in Georgia, undermining DPG's efforts to successfully help elect Democratic candidates to office. In recent elections, for example, absentee voters have disproportionately voted for Democratic candidates. For example, in the 2018 general election, the majority of absentee voters supported the Democratic candidate for governor (137,616 out of the 223,576 absentee ballots cast—or 61.5 percent).

Thus, Georgia's standardless notification process and Gwinnett County's absentee ballot envelope design disproportionately impacts and undermines DPG's efforts to successfully help elect candidates of the Democratic Party to office.

20.     Further, as part of DPG's get-out-the-vote efforts, it engages in a robust absentee voter contact program designed to: (i) inform thousands of voters statewide of their ability to cast absentee ballots; (ii) explain the rules and deadlines governing vote by mail; and (iii) encourage voters to utilize vote by mail. Georgia's laws regarding missing and mismatched signatures decrease overall confidence in the absentee voting processes, and Georgia's voting scheme generally, thereby directly undermining the efforts of DPG to encourage voters to utilize absentee ballots and to assist them in exercising their right to vote. Because of Georgia's flawed absentee voting notification procedure and Gwinnett County's deficient absentee ballot envelope design, DPG will have to divert resources to provide support for voters to help them avoid disenfranchisement and overcome the burdens they face as a result of these flawed laws, procedures, and absentee voting materials—resources it otherwise would use to educate voters about issues and individual candidates.

21.     Plaintiff DSCC is a Democratic political committee established and maintained by a national political party, as defined by and used in 11 C.F.R. § 110.2(c)(2)(iii) and provided for in 52 U.S.C. § 30116(h).  DSCC's mission is to

elect candidates of the Democratic Party to the U.S. Senate, including in Georgia, where there will be a competitive Senate election in 2020. DSCC works to accomplish its mission by, among other things, contributing money to Democratic candidates for U.S. Senate, making expenditures on behalf of Democratic candidates for U.S. Senate, and assisting state parties throughout the country, including in Georgia, in the development and implementation of programs benefiting Democratic candidates for Senate and other federal, state, and local offices, such as get-out-the-vote and generic party efforts undertaken on behalf of the Democratic ticket. In 2018, DSCC made contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic Senate candidates. In 2020, Georgia voters will be electing two U.S. Senators and DSCC intends to make substantial contributions and expenditures to support Democratic candidates for U.S. Senate in Georgia in 2020. DSCC also intends to provide assistance to the state party.

22.    DSCC is directly harmed by Georgia's standardless notification process and Gwinnett County's deficient absentee ballot envelope because each frustrates its mission and efforts to elect Democratic Party candidates in Georgia to the Senate. In recent elections, for example, absentee voters have disproportionately voted for Democratic candidates. For example, in the 2018 general election, the majority of absentee voters supported the Democratic candidate for governor (137,616 out of

the 223,576 absentee ballots cast—or 61.5 percent). Thus, Georgia's standardless notification process and Gwinnett County's deficient absentee ballot envelope disproportionately impacts and undermines DSCC's efforts to successfully help Democratic U.S. Senate candidates to office. In an election year in which Georgia is projected to have a closely-watched Senate race, it is crucial that every single eligible voter's vote is counted. But because Georgia's absentee ballot regime consistently disenfranchises Georgia voters—and particularly Democratic voters—DSCC will have to divert resources to provide support for voters, resources it otherwise would use to educate voters about issues and individual candidates.

23.    DCCC is the national congressional committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). DCCC's mission is electing Democratic candidates to the U.S. House of Representatives from across the United States, including from Georgia's 14 congressional districts. DCCC works to accomplish its mission by, among other things, making expenditures for, and contributions to, Democratic candidates for U.S. Congress and assisting state parties throughout the country, including in Georgia. For 2020, DCCC will expend significant resources to support Democratic candidates in a number of targeted races in Georgia's 14 congressional districts, including the 7th Congressional District, which includes parts of Gwinnett County. Overall, in 2020, DCCC expects to make contributions

and expenditures in the millions of dollars to persuade and mobilize voters to support Democratic candidates in congressional elections around the country. DCCC also provides assistance to the state Democratic parties in the development and implementation of programs benefiting Democratic candidates for federal, state, and local office, including get-out-the-vote initiatives and other initiatives designed to increase turnout by Democratic voters.

24.    DCCC is directly harmed by Georgia's standardless notification process and Gwinnett County's deficient absentee ballot envelope because each frustrates its mission and efforts to elect candidates to the U.S. House of Representatives in Georgia. In recent elections, for example, absentee voters have disproportionately voted for Democratic candidates. For example, in the 2018 general election, the majority of absentee voters supported the Democratic candidate for governor (137,616 out of the 223,576 absentee ballots cast—or 61.5 percent). Thus, Georgia's standardless notification process and Gwinnett County's absentee ballot envelope disproportionately impacts and undermines DCCC's efforts to successfully help elect Democratic congressional candidates to office. Just as in 2018, where the DCCC supported candidates who lost by mere hundreds of votes, the 2020 Georgia congressional elections are expected to be close and it is increasingly important to ensure that every vote counts. But because Georgia's

absentee ballot regime consistently disenfranchises Georgia voters—and particularly Democratic voters—DCCC will have to divert resources to provide support for voters, resources it otherwise would use to educate voters about issues and individual candidates.

25.    Defendant BRAD RAFFENSPERGER is sued for declaratory and injunctive relief in his official capacity as the Secretary of State of Georgia (hereinafter "Raffensperger" or the "Secretary"). The Secretary of State is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the law or laws at issue in the suit," *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011), *i.e.*, the election laws in the State of Georgia. Specifically, the Secretary is the chief elections officer of the State and is therefore responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b). The Secretary is responsible for "furnish[ing] . . . oaths of assisted electors, . . . [and] envelopes and instruction sheets for absentee ballots," and other supplies. *Id.* at § 21-2-50(a)(5). The Secretary also determines the content of the oath on the back the ballot envelopes. *See id.* at § 21-2-384(b), (c). The Secretary serves as the Chair of the State Election Board, which is the body responsible for ensuring uniform election practice in Georgia.

26.    Defendants REBECCA N. SULLIVAN, DAVID J. WORLEY, SETH

HARP, and ANH LEE (hereinafter, "State Election Board" or "State Election Board Members"), are members of the State Election Board in Georgia, responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." *Id.* at § 21-2-31(1). The State Election Board Members are responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at § 21-2-31(2). The State Election Board Members, personally and through the conduct of their employees, officers, agents, and servants, acted under color of state law at all times relevant to this action, and are sued for declaratory and injunctive relief in their official capacities.

27.     The Secretary of State and the State Election Board have the authority to direct the officials in each county who are responsible for administering elections (that is, the county elections board or the superintendent of elections) (collectively "the County Election Officials").

28.     Defendants STEPHEN   DAY,   JOHN   MANGANO,   ALICE

O'LENICK, BEN SATTERFIELD and BEAUTY BALDWIN are sued for declaratory and injunctive relief in their official capacities as members of the Gwinnett County Board of Registration and Elections (hereinafter, collectively, "Gwinnett Board Members" or "Gwinnett Board"). The Gwinnett Board has the authority to exercise the powers and duties of a county election superintendent with respect to conducting elections in Gwinnett County, *see* O.C.G.A. § 21-2-70 to -77. The Gwinnett Board is required "[t]o make and issue such rules, regulations, and instructions, consistent with law, including the rules and regulations promulgated by the State Election Board, as he or she may deem necessary for the guidance of poll officers, custodians, and electors in primaries and elections," *id*. at § 21-2-70(7), and "[t]o conduct all elections . . . and to perform such other duties as may be prescribed by law," *id.* at § 21-2-70(13). The Gwinnett Board is responsible for preparing, obtaining, and delivering the absentee ballot and ballot envelopes to voters, and for "print[ing] the form of the oath of the elector and the oath for persons assisting electors . . . and the penalties . . . for violations of the oaths" on the back of the envelopes. *Id.* at § 21-2-384(a)(1), (b).

## STATEMENT OF FACTS AND LAW

29.    Georgia law authorizes any eligible voter to cast his or her absentee ballot by mail. O.C.G.A. § 21-2-380(b). To obtain an absentee ballot, the voter must

submit a written application containing the voter's name, registration address, mailing address (if different), the election the voter wishes to participate in, and the name and relationship of the person requesting the ballot if other than the elector. *Id.* at § 21-2-381(a)(1)(A), (C). The voter may submit the application by mail, facsimile, email, or in person. *Id.* at § 21-2-381(a)(1)(A).

30.    If the board of registrars or the absentee ballot clerk verifies that the voter is eligible to vote and verifies the voter's signature, the registrar or clerk mails out the absentee ballot within three business days of receiving the application. *Id.* at § 21-2-381(b)(1)-(2); Ga. Comp. R. & Regs. 183-1-14-.11.

31.    When an absentee voter receives an official absentee ballot, he or she receives two envelopes. O.C.G.A. § 21-2-384(b). The voter must place the completed absentee ballot in the smaller of the two envelopes. *Id.* The smaller envelope must then be placed in the larger envelope, which contains the oath of the voter—referred to as an "elector" in the oath—and a line for the voter's signature on the back of the envelope. *Id.* at § 21-2-384(b)-(c).

32.    The form of the oath is specified by O.C.G.A. § 21-2-384(c)(1), which states that: The oaths referred to in subsection (b) of this Code section shall be in substantially the following form:

> I, the undersigned, do swear (or affirm) that I am a citizen of the United States and of the State of Georgia; that I possess the qualifications of

an elector required by the laws of the State of Georgia; that I am entitled to vote in the precinct containing my residence in the primary or election in which this ballot is to be cast; that I am eligible to vote by absentee ballot; that I have not marked or mailed any other absentee ballot, nor will I mark or mail another absentee ballot for voting in such primary or election; nor shall I vote therein in person; and that I have read and understand the instructions accompanying this ballot; and that I have carefully complied with such instructions in completing this ballot. I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law.

_____
Signature or Mark of Elector
_____
Printed Name of Elector

33.    The ballot envelope must also include an oath for those who are

assisting absentee voters, in substantially the following form:[2]

Oath of Person Assisting Elector (if any):

I, the undersigned, do swear (or affirm) that I assisted the above-named elector in marking such elector's absentee ballot as such elector personally communicated such elector's preference to me; and that such elector is entitled to receive assistance in voting under provisions of subsection (a) of Code Section 21-2-409.

This, the _____ day of _____, _____.

_____

---

[2] Before the General Assembly amended the law in April 2019, the oath required the voter include the county in which they reside, residential address, and birth year. O.C.G.A. § 21-2-384(c)(1) (July 2017).

_____
Signature of Person Assisting Elector

Reason for assistance (Check appropriate square):

☐ Elector is unable to read the English language.

☐ Elector requires assistance due to physical disability. . . .

Georgia law provides that any person who knowingly falsifies information so as to vote illegally by absentee ballot or who illegally gives or receives assistance in voting, as specified in Code Section 21-2-568 or 21-2-573, shall be guilty of a felony.

O.C.G.A. § 21-2-384(c)(1).

34.    Upon completing the absentee ballot, the voter must secure the ballot in the small envelope, enclose it in the larger envelope, sign the oath on the back of the envelope, and return it to the board of registrars or absentee clerk by mail or in person. *Id*. at § 21-2-386(a)(1).

35.    All absentee ballots must be received by 7:00 p.m. on Election Day to be counted. *Id.* at § 21-2-386(a)(1)(F).

36.    Pursuant to O.C.G.A. § 21-2-386(a)(1)(B), "[u]pon receipt of each ballot," the registrar or clerk must inspect the information on the oath, including the voter's signature, and compare the signature to the signature on the voter's registration card or absentee ballot application to determine whether they match.

37.    If a signature is missing from the oath on the absentee ballot envelope

or "does not appear to be valid," (i.e. mismatched), the clerk must "write across the face of the envelope 'Rejected,' giving the reason therefor. . . . [and] shall promptly notify the elector of such rejection." *Id.* at § 21-2-386(a)(1)(C).

38.     Absentee ballots that have been marked "Rejected" for missing or mismatched signatures will only be counted only if: (1) the voter submits "an affidavit to the board of registrars or absentee ballot clerk" along with a copy of an accepted form of identification no later than three days following the election, *id.* at §§ 21-2-386(a)(1)(C),-417(c), -419(c); (2) the affidavit is in the proper form such that it "affirm[s] that the ballot was submitted by the elector, is the elector's ballot, and that the elector is registered and qualified to vote in the primary, election, or runoff in question, *id.* at § 21-2-386(a)(1)(C); and (3) "the board of registrars or absentee ballot clerk finds the affidavit and identification to be sufficient," *id*.[3]

39.     Voters whose absentee ballots have been marked "Rejected" must submit the cure affidavit and a copy of an accepted ID no later than three days after

---

[3] Though the law now provides voters with an opportunity to cure a missing signature, Georgia regulations inconsistently provide that "[i]f the board of registrars or absentee ballot clerk rejects" an absentee ballot for a missing signature, the voter "shall be provided the opportunity to vote in the [given election] either *by applying for a second absentee ballot* prior to the day before such [election] or *by voting in person* at the [voter's] polling place on the day of the [election]." Ga. Comp. R. & Regs. 183-1-14-.09 (emphasis added).

the day of the election to cure the missing or mismatched signature. O.C.G.A. §§ 21-2-386(a)(1)(C), -419(c).

40.     As described above, the law does not define "prompt" notification; nor does it specify the method of notification a board of registrars or absentee clerk must use. And, neither the Secretary nor the State Election Board has issued rules or regulations defining or identifying the proper form of prompt notification.

41.     As a result, counties inconsistently interpret the promptness of the notice required and employ varying methods of contacting voters. For example, during the 2018 general election Gwinnett County sent notice by mail within three days of marking the absentee ballot "Rejected." Thus, voters whose absentee ballots arrived on election day did not receive notice until the cure period had ended. These voters were ultimately disenfranchised. Likewise, voters whose absentee ballots were received and reviewed within two days of the election were given only one or two days to cure their absentee ballot.

42.     Given that absentee ballots are valid if received by 7:00 p.m. on Election Day, *id.* at § 21-2-386(a)(1)(F), and that voters have three days after the day of the election to cure a missing or mismatched signature, *id.* at §§ 21-2-386(a)(1)(C), -419(c), had voters received sufficient notice, there is no reason that they could not have cured their absentee ballots as the law contemplates.

43.    By contrast, during the 2018 general election, election officials in Forsyth and Bulloch Counties first attempted to call and/or email voters to inform them that their signatures were "invalid" or missing from their absentee ballots and to encourage them to cure their ballots, meaning that these voters were informed of the defect nearly instantaneously and, solely because of where they lived, were given a meaningful opportunity to cure.

44.    The impact of Georgia's standardless notification procedure is demonstrated by the varying rejection rates across the state. Of the 30,214 absentee ballots cast in Gwinnett County during the 2018 general election, County Election Officials rejected 117 of them for missing signatures, which accounts for nearly 7 percent of the total absentee ballots rejected in Georgia (1,690). Of the 30,877 absentee ballots received in Cobb County, election officials rejected just twenty for missing or mismatched signatures (3 percent of the 662 absentee ballots rejected in the county). In Forsyth County, officials rejected 99 out of the 5,228 absentee ballots cast (1.9 percent); 25 of those ballots were rejected for missing or mismatched signatures (25 percent of the rejected ballots). Given the lack of uniformity among the counties, the risk of disenfranchisement will continue to be dependent on where a voter lives and how that county chooses to contact the voter under the current law.

45.    While the standardless process for notifying absentee voters of missing

or mismatched signatures leaves all absentee voters across Georgia at risk of disenfranchisement, the burden is exacerbated in Gwinnett County due to the deficient design of the County's absentee ballot envelope. This is particularly concerning because more than 44.5 percent of the registered vote of Gwinnett County are people of color, with black or African-American voters making up one-third (27 percent) of Gwinnett County's active voting population, and the Hispanic/Latino population making up 8.7 percent of active voters. Gwinnett County also has the largest number of active American Indian or Alaskan Native voters, Asian or Pacific Islander voters, and Hispanic/Latino voters in the State. During the 2018 general election, ballots cast by African Americans and Hispanics/Latinos made up 49 percent of rejected absentee ballots in the County.

46.    Georgia law provides that each county superintendent must design the absentee ballot envelope to include the oath specified by the Secretary and described in O.C.G.A. § 21-2-384(c)(1). *See id.* § 21-2-384(a)(1), (b), (c).

47.    The ballot envelope designs, however, can vary based on county-specific needs. For example, Gwinnett County is the only county in the State required under federal mandate to provide all voting materials in both English and Spanish, given its large Hispanic/Latino population. Thus, as described above, Gwinnett County's absentee ballot envelope design differs from other counties'

envelopes.

48.     As a result, unlike the simpler and easier to read absentee ballot envelopes in Fulton or Dekalb Counties, Gwinnett County's ballot is nearly illegible. The oath is printed on absentee ballot envelopes in small, approximately 6.5-point font in both English and Spanish. At the top of the envelope, the English and Spanish oaths are on top of each other; but on the bottom, the English and Spanish oaths for assisting electors are on the left and right side, respectively. The envelope's poor design is cramped and difficult for voters to read and understand. By way of example, below is the back of the absentee ballot envelope used during the November 2018 general election:

## OATH OF ELECTOR

I, the undersigned, do swear (or affirm) that I am a citizen of the United States and of the State of Georgia; that my residence address, for voting purposes, is as listed below, _____ County, Georgia; that I possess the qualifications of an elector required by the laws of the State of Georgia; that I am entitled to vote in the precinct containing my residence in the primary or election in which this ballot is to be cast; that I am eligible to vote by absentee ballot; that I have not marked or mailed any other absentee ballot, nor will I mark or mail another absentee ballot for voting in such primary or election; nor shall I vote therein in person; and that I have read and understand the instructions accompanying this ballot; and that I have carefully complied with such instructions in completing this ballot. I understand the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law O.C.G.A. Section 21-2-384(c), and O.C.G.A. Section 21-2-570.

## JURAMENTO DEL ELECTOR

Yo, el abajo firmante, juro (o afirmo) que, soy un ciudadano de los Estados Unidos y del Estado de Georgia; que mi domicilio para efectos de votación es como se muestra en la parte inferior, Condado de _____, Georgia; que cumplo los requisitos de un elector requeridos por las leyes del Estado de Georgia; que tengo derecho a votar en el distrito que comprende mi residencia en la elección primaria o en la elección en que este voto será emitido; que califico para votar mediante boleta de voto ausente; que no he marcado o enviado por correo ninguna otra boleta de voto ausente para votar en dicha elección primaria o en dicha elección y que tampoco votaré en ese lugar en persona; que he leído y entendido las instrucciones que acompañan esta boleta, y que he cumplido cuidadosamente las instrucciones para completarla. Entiendo que la oferta o la aceptación de dinero o cualquier otro objeto de valor para votar por un candidato en particular, lista de candidatos, tema o lista de temas incluidos en esta elección constituye un acto de fraude electoral y es un delito grave bajo la ley de Georgia O.C.G.A. Section 21-2-384(c), y O.C.G.A. Section 21-2-570.

**Elector's Residence Address/Dirección de Residencia del Elector**

_____ (Street Number/Número de la calle)       _____ (Street Name/Nombre de la calle)

_____ (Apartment/Apartamento)   (City/Ciudad)       _____ (State/Estado)   _____ (Zip Code/Código postal)

**Year of Elector's Birth/Año de nacimiento del elector:** _____

**Sign here/Firme aquí:** _____
(SIGNATURE OR MARK OF ELECTOR/FIRMA O MARCA DEL ELECTOR)

---

### OATH OF PERSON ASSISTING ELECTOR (IF ANY)

I, the undersigned, do swear (or affirm) that I assisted the above-named elector in marking such elector's absentee ballot as such elector personally communicated such elector's preference to me, and that such elector is entitled to receive assistance in voting under provisions of subsection (a) of Code Section 21-2-409.   This, the _____ day of _____, 20 _____.

_____
SIGNATURE OF PERSON ASSISTING ELECTOR

_____
**Relationship to Elector**

Reason for assistance (Check appropriate square):

☐ Elector is unable to read the English language.

☐ Elector requires assistance due to physical disability.

**PENALTIES:** Georgia law provides, in subsection (b) of Code Section 21-2-409, that no person shall assist more than ten electors in any primary, election, or runoff in which there is no federal candidate on the ballot. Georgia law further provides that any person who knowingly falsifies information so as to vote illegally by absentee ballot or who illegally gives or receives assistance in voting, as specified in Code Sections 21-2-568, 21-2-573 or 21-2-579 shall be guilty of a felony.

### JURAMENTO DE LA PERSONA QUE ASISTE AL ELECTOR (SI CORRESPONDE)

Yo, el abajo firmante, juro (o afirmo) que ayudé al elector antes nombrado a marcar su boleta de voto ausente con la preferencia que me comunicó personalmente ese elector y que dicho elector tiene el derecho de recibir asistencia para votar en virtud de las disposiciones del inciso (a) de la sección 21-2-409 del código.   Este, el día _____ de _____ del 20 _____.

_____
FIRMA DE LA PERSONA QUE ASISTE AL ELECTOR

**RELACIÓN CON DICHA PERSONA**

Razón para recibir asistencia (Marque la casilla adecuada):

☐ El elector es incapaz de leer el idioma inglés.

☐ El elector necesita asistencia debido a una discapacidad física.

**SANCIONES:** La ley de Georgia establece en el inciso (b) de la sección 21-2-409 del código que ninguna persona asistirá a más de diez electores en cualquier elección primaria, elección o segunda vuelta en la que no haya ningún candidato federal en la boleta. La ley de Georgia establece que toda persona que falsifique información deliberadamente para votar de manera ilegal mediante boleta de voto ausente o que de manera ilegal dé o reciba asistencia para votar como se especifica en las secciones 21-2-568, 21-2-573 o 21-2-579 del código será culpable de un delito grave.

CIV-M-US-18

*STOP / Haga una pausa*

*Have you completed and signed the oath? / ¿Ha completado y firmado el juramento?*

*Have you placed your ballot in the white envelope and sealed it? / ¿Ha colocado su boleta en el sobre blanco y lo ha sellado?*

*Have you affixed sufficient postage? / ¿Ha colocado suficiente estampilla?*

49.     At least one study has shown that rejection of absentee ballots for technical errors such as failing to sign the absentee envelope is caused by poorly designed and unusable absentee ballot envelopes. Brennan Center, *Better Design, Better Elections* at 30-33, https://www.brennancenter.org/sites/default/files/2019-08/Report_Better_Design_ Better_Elections.pdf (last visited, Nov. 4, 2019). And when the envelopes are redesigned to be clearer and more readable, the number of unsigned ballots significantly decreases. *Id.*

50.     Though the 2019 amendments to O.C.G.A. § 21-2-384(c)(1) ensure that the voter's address and birth year will be removed from the oath above, because the oath contains largely the same language as before, it is anticipated that Gwinnett County's updated absentee ballot envelope will be substantially similar to the format set out above, meaning that it will continue to be dense and unreadable, confusing voters and making it difficult for them to properly complete their absentee ballot envelope.

51.     Given the poor design of Gwinnett County's absentee ballot envelope, and the grossly inadequate notification procedures described *supra*, the County unsurprisingly rejects absentee ballots at an alarmingly higher rate than other counties for missing or mismatched signatures. During the 2018 general election, even after multiple lawsuits prohibiting election officials from rejecting absentee

ballots for missing or inaccurate oath information and permitting absentee voters to cure mismatched signatures on their absentee ballots, Gwinnett County still ultimately rejected 117 absentee ballots for missing or mismatched signatures.

52.    Meanwhile other counties rejected a lower number of ballots for missing or mismatched signatures. For example, in Dekalb County during the 2018 general election, election officials rejected only 15 absentee ballots for missing or mismatched signatures. And in Fulton County, the most populous county in Georgia, election officials rejected just two ballots for a missing or mismatched signature. Indeed, Gwinnett County had a significantly higher rate of rejecting absentee voters than any other county in the state during the 2018 general election. This high rejection rate is particularly significant because Gwinnett County comprises approximately 8 percent of active voters in Georgia, the second largest number of active voters out of every county in the State. And the high absentee ballot rejection rate within Gwinnett County disproportionately impacts racial, ethnic, and language minorities.

53.    The wide disparity in rejection rates between Gwinnett County and other counties in the state demonstrates that the deficient design, dense language, and small type of the oath on Gwinnett County's absentee ballot envelopes has caused voters to submit their ballots without properly completing the signature

requirement. And, as described above, even with changes to the oath for future elections as compared to the oath in 2018, the Gwinnett County absentee ballot envelope will continue to be confusing and illegible for voters.

## COUNT I

**Due Process**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
***Denial of Procedural Due Process by Defendants Raffensperger and State Election Board Members***

54.    Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

55.    The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of …liberty…without due process of law." U.S. Const. amend. XIV, § 1. This due process principle protects the fundamental right to vote. And "[h]aving induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted." *Saucedo*, 335 F. Supp. 3d at 217.

56.    Due process requires that all voters in Georgia be afforded a meaningful notice and an opportunity to cure missing or mismatched signatures before a voter's ballot is permanently rejected. The current "prompt notification" law set out in O.C.G.A. § 21-2-386(a)(1)(C) fails to provide such process and, as a result, voters'

ballots are not fairly considered and counted, even where the voter is wholly eligible to vote and, with proper notice, could have cured his or her absentee ballot.

57.   As numerous other courts have found, a state's failure to ensure that all absentee ballots are not rejected before a voter is notified and provided a meaningful opportunity to be heard violates a voter's procedural due process rights. *See, e.g.*, *Saucedo*, 335 F. Supp. 3d at 222; *Martin v. Kemp*, 341 F. Supp. 3d at 1339–40; *Zessar v. Helander*, No. 1:05-cv-1917, 2006 WL 642646, at *6-10 (N.D. Ill. Mar. 13, 2006), *vacated as moot sub. nom. Zessar v. Keith*, 536 F.3d 788 (7th Cir. 2008); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357-58 (D. Ariz. 1990).

58.   Because voting is a fundamental right, the risk that even one person will be disenfranchised for failure to include a signature or for a mismatched signature given the differing interpretations and procedures for prompt notice is too significant for Georgia to justify depriving absentee voters a uniform pre-rejection notice that ensures a meaningful opportunity to be heard.

## COUNT II

**Equal Protection**
**U.S. Const. amend. XIV, 42 U.S.C. § 1983**
*Infringement of the Fourteenth Amendment's*
*Guarantee of Equal Protection by Defendants Raffensperger and State Election*
*Board Members*

59.     Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

60.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional provision requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Bush v. Gore*, 531 U.S. 98, 104–05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another[,]" and holding Equal Protection Clause applies to "the manner of [the] exercise [of voting].").

61.     The varied county by county interpretations of "promptly notify" under O.C.G.A. § 21-2-386(a)(1)(C) subject similarly situated absentee voters to differing standards under each county's application of the provision, resulting in some voters

- 31 -

being wholly disenfranchised and/or having less time to cure their absentee ballots than other voters solely based on where they live.

62.     Defendants Raffensperger and the State Election Board Members have failed to ensure that Georgia absentee voters are treated equally regardless of the county in which they reside. Due to this disparate treatment, certain absentee voters who cast ballots in the upcoming 2020 election will face burdens and infringements on their fundamental right to vote that other, similarly situated voters will not face due solely to the county in which they vote.

63.     Defendants' unequal treatment of these voters is not justified by, and is not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means.

64.     Based on the foregoing, Defendants Raffensperger and the State Election Board Members, acting under color of state law, have deprived and will continue to deprive Plaintiffs, their constituents, and other Georgia voters of equal protection under the law secured to them by the Fourteenth Amendment to the United States Constitution and protected by 42 U.S.C. § 1983.

## COUNT III

**First Amendment and Equal Protection**
**U.S. Const. amends. I, XIV, 42 U.S.C. § 1983**
*Undue Burden on the Right to Vote by Defendants Raffensperger and State*
*Election Board Members*

65.     Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

66.     Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) (internal quotation marks omitted).

67.     The counties' standardless interpretations of "promptly notify" under O.C.G.A. § 21-2-386(a)(1)(C) impose a severe burden on the right to vote for absentee voters across the state, leaving them at risk of being wholly disenfranchised

due to the disparate process for notice applied by each county.

68.     This burden is not outweighed by any legitimate, much less compelling, state interest in the law, and countless eligible, registered Georgia voters will suffer direct and irreparable injury if Defendants fail to ensure that a uniform standard for prompt notice is applied in each county. Without relief from this Court, these voters will be deprived of their right to vote in upcoming elections.

69.     Based on the foregoing, Defendants Raffensperger and the State Election Board Members, acting under color of law, will deprive Plaintiffs, their members, constituencies, and the voters who support them, the rights secured to them by the First and Fourteenth Amendments to the U.S. Constitution and protected by 42 U.S.C. § 1983.

## **<u>COUNT IV</u>**

### **First Amendment and Equal Protection**
### **U.S. Const. amends. I, XIV, 42 U.S.C. § 1983**
### *Undue Burden on the Right to Vote by Defendant Gwinnett Board Members*

70.     Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

71.     Under the Equal Protection Clause of the Fourteenth Amendment and the First Amendment, a state cannot utilize election practices that unduly burden the

right to vote. A court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (Stevens, J., controlling opinion) (internal quotation marks omitted).

72.   The deficient absentee ballot design created by the Defendant Gwinnett Board Members will impose a burden on Plaintiffs, their constituents, and other Georgia voters in Gwinnett County.

73.   The Gwinnett County absentee ballot envelope is a densely-worded, poorly designed form, with instructions alternating in English and Spanish, printed in approximately size 6.5-point font and provides no clear notice that a signature is mandatory. As a result, the form is confusing to voters and makes it far more likely that they will be unable to properly complete the signature requirement for absentee ballots. This burden is particularly severe for African-Americans and Latinos, who make up over 35 percent of Gwinnett County's active voting population, and 49 percent of rejected absentee ballots during the 2018 general election.

74. Further, the threat of disenfranchisement in Gwinnett County is particularly high given Gwinnett's ineffective notice procedures for absentee ballots.

75. Without action from this Court, a significant number of voters will have their right to vote burdened, if not wholly denied, in upcoming elections due to Gwinnett County's absentee ballot envelope design, which places these voters at a heightened risk of returning an absentee ballot without properly completing the signature requirement and increase the risk that their ballots will be rejected.

76. The use of a densely-worded and confusing absentee ballot envelope, exposing voters to the risk of having their ballots rejected for missing or mismatched signatures, for the reasons discussed herein, is not supported by any material or important government interest (indeed, other counties are able to use absentee ballot envelopes that are much easier to understand). Moreover, any benefits are plainly outweighed by the severe burden on voters.

77. Based on the foregoing, the Defendant Gwinnett Board Members, acting under color of law, will deprive absentee voters residing in the county, the rights secured to them by the First and Fourteenth Amendments to the U.S. Constitution and protected by 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully request that this Court enter judgment:

a)   Declaring that O.C.G.A. § 21-2-386(a)(1)(C) violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution because the "shall promptly notify" standard fails to provide all Georgia voters with notice and a meaningful opportunity to contest the status of their absentee ballot and cure their ballots before rejecting them;

b)   Declaring that O.C.G.A. § 21-2-386(a)(1)(C) violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because it fails to provide a uniform standard by which election officials "shall promptly notify" Georgia citizens of their rejected ballots;

c)   Declaring that the lack of uniform standards for providing notice to Georgia voters regarding their rejected absentee ballots is unduly burdensome in violation of the First and Fourteenth Amendments of the United States Constitution;

- 37 -

d)   Declaring that the Gwinnett County's absentee ballot envelope design is unduly burdensome in violation of the First and Fourteenth Amendments of the United States Constitution;

e)   Requiring the Secretary and the State Election Board to instruct County Election Officials to notify voters of missing signatures by telephone, email, and/or text message within one day of receiving the absentee ballot;

f)   Preliminarily and permanently enjoining the Gwinnett Board from creating, preparing, and distributing absentee ballot envelopes with a confusing, illegible design;

g)   Awarding Plaintiffs costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and granting such other and further relief as the Court deems just and proper.

Dated: November 6, 2019                    Respectfully submitted,


                                           **Halsey G. Knapp, Jr.**
                                           Halsey G. Knapp, Jr.
                                           Georgia Bar No. 425320
                                           Joyce Gist Lewis
                                           Georgia Bar No. 296261
                                           KREVOLIN & HORST, LLC
                                           One Atlantic Center
                                           1201 W. Peachtree St., NW, Suite 3250
                                           Atlanta, GA 30309
                                           Telephone: (404) 888-9700
                                           Facsimile: (404) 888-9577
                                           hknapp@khlawfirm.com
                                           jlewis@khlawfirm.com

                                           Marc E. Elias*
                                           Bruce V. Spiva*
                                           John Devaney*
                                           Amanda R. Callais*
                                           K'Shaani Smith*
                                           **PERKINS COIE LLP**
                                           700 Thirteenth Street, N.W., Suite 600
                                           Washington, D.C. 20005-3960
                                           Telephone: (202) 654-6200
                                           Facsimile: (202) 654-6211
                                           MElias@perkinscoie.com
                                           BSpiva@perkinscoie.com
                                           JDevaney@perkinscoie.com
                                           ACallais@perkinscoie.com
                                           KShaaniSmith@perkinscoie.com

                                           *Counsel for Plaintiffs*

                                           **Pro Hac Vice* Applications Forthcoming

- 39 -

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Plaintiffs' Complaint for Injunctive and Declaratory Relief has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: November 6, 2019                     **<u>Halsey G. Knapp, Jr.</u>**
                                            *Counsel for Plaintiffs*